IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

DOUGLAS S. SWANN,
    Plaintiff,

vs.                                     Case No. 3:07cv129/LAC/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
    Defendant.
_____/

**REPORT AND RECOMMENDATION**

        This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act (Act) and related statutes, 42 U.S.C. § 401, *et seq*. It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for disability insurance benefits (DIB) under Title II of the Act, 42 U.S.C. §§ 401–34, and for Supplemental Security Income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

        Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.     PROCEDURAL HISTORY

        Plaintiff filed applications for DIB and SSI on June 23, 2004 (Tr. 48–51, 456–58).[1]  In each

---

[1] All references to "Tr." refer to the Transcript of Social Security Administration Record filed on May 30, 2007 (*see* Docs. 5, 6).

application he alleged disability commencing April 1, 2003 (*id.*). The applications were denied initially and on reconsideration (Tr. 28–38). On November 3, 2006, following a hearing, an administrative law judge (ALJ) rendered a decision in which he found that Plaintiff was not eligible for Social Security benefits (Tr. 13–22). On March 7, 2007, the Appeals Council of the Social Security Administration denied Plaintiff's request for review (Tr. 6–8). Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court. Falge v. Apfel, 150 F.3d 1320 (11th Cir. 1998). This appeal followed.

II.     FINDINGS OF THE ALJ

On November 3, 2006 the ALJ made several findings relative to the issues raised in this appeal (Tr. 13–22):

1)   Plaintiff meets the insured status requirements of the Act through March 31, 2009.

2)   Plaintiff has not engaged in substantial gainful activity (SGA) since April 1, 2003, the alleged onset of disability date (20 C.F.R. §§ 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*)[2]

3)   Plaintiff has the following severe impairments: seizure disorder, dysthymic disorder and obsessive compulsive disorder (20 C.F.R. § 404.1520(c)).

4)   Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).

5)   Plaintiff has the residual functional capacity (RFC) to perform work at all levels of exertion with moderate limitations as to being able to maintain a regular work schedule or complete a normal work week without interruptions or an unreasonable number of length of rest periods.

6)   Plaintiff is capable of performing his past relevant work as a cashier. This work does not require the performance of work-related activities precluded by Plaintiff's RFC (20 C.F.R. § 404.1565).

---

[2]In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI. However, separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416). Therefore, hereafter, citations in this report and recommendation should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

    7)        Plaintiff has not been under a "disability," as defined in the Act, from April 1, 2003 through November 3, 2006, the date of the ALJ's decision (20 C.F.R. § 404.1520(f)).

## III. STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance, it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any [SGA] by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing SGA, he is not disabled.

2.      If the claimant is not performing SGA, his impairments must be severe before he can be found disabled.

3.      If the claimant is not performing SGA and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his RFC and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY[3]

    A.    Personal/Employment History

Plaintiff was born in 1977 and was twenty-eight years old at the time of his hearing before the ALJ (Tr. 480–90). He completed high school, obtained a two-year college degree (an AA in

---

[3] Unless otherwise indicated, the information in this section is derived from the opinion of the ALJ.

Case No. 3:07cv129/LAC/EMT

general studies), and had previous work experience as a cashier (Tr. 77, 481–83). He alleged disability based on obsessive-compulsive disorder (OCD) and epilepsy (seizure disorder) (Tr. 77). Plaintiff testified that he has had OCD since he was eighteen, noting that he is a constant hand washer, door checker, and stove checker. Plaintiff testified that he sometimes takes showers that last up to fifteen minutes and sometimes stays in the bathroom for three to four hours. He used to go to Lakeview Center but testified at the hearing that he no longer goes because it became expensive and he felt as if he was not getting what he needed. He also testified that he had seizures in January and June of 2006 and was prescribed Prozac. He last worked in September 2005.

      B.      Relevant Medical History — Mental[4]

Plaintiff has been diagnosed with and treated for OCD since at least September 2003 (with some earlier treatment in 1999). Treatment notes from Lakeview Counseling Center (Lakeview) dated September 29, 2003, indicate that Plaintiff presented for treatment to "be able to live a more normal life." Plaintiff noted that he had previously been treated by Dr. Henry Dohn in 1999; however, he discontinued treatment and was not presently taking any medication to treat his condition (Tr. 183–89). Plaintiff indicated that he was obsessed with germs and cleanliness, he washes his hands five times before dressing, and his behavior causes him to be late for work. An intake counselor at Lakeview opined that Plaintiff had a Global Assessment of Functioning (GAF) score of 46 (Tr. 189).[5]

In October 2003, William J. Billett, M.D., examined Plaintiff and indicated that Plaintiff's GAF score was still serious. He increased Plaintiff's dosage of Prozac. On November 7, 2003, Dr. Billett noted that Plaintiff had not had any treatment for the last three to four years (Tr. 287). He diagnosed Plaintiff with OCD, but noted that due to the relatively late onset of OCD symptoms,

---

[4]The court notes that the record also contains evidence of Plaintiff's physical impairments, but Plaintiff has raised no issue in the instant appeal regarding the ALJ's consideration of his physical impairments. Thus, the summary of Plaintiff's medical history does not include any evidence regarding Plaintiff's physical impairments unless relevant to the issues in this case.

[5]Global assessment of functioning is the overall level at which an individual functions including social, occupational, academic, and other areas of personal performance. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994). It may be expressed as a numerical score. *Id.* at 32. A score between 41 and 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.*

Plaintiff should undergo an MRI to rule out any organic causes (Tr. 288). Plaintiff was assessed with a GAF score of 50 and prescribed Prozac (*id.*). In January 2004, Plaintiff reported that he was tolerating the Prozac well and noted that his OCD symptoms had "significantly improved" (Tr. 279). Dr. Billett stated that Plaintiff was "clearly responding to the Prozac" and noted that Plaintiff was washing his hands "much less frequently," his obsessive thoughts were "occurring less frequently," he was sleeping better and had less anxiety, he was not depressed, and he was eating well (*id.*). In April 2004, Plaintiff reported that his symptoms had "worsened a little," but Dr. Billett explained that it takes approximately six months to determine whether the medication will be effective long term and to find the right dosage (Tr. 272). Plaintiff's dosage of Prozac was increased (*id.*). In June 2004, Plaintiff reported "overall improvement," specifically noting that his hand washing was not "occurring nearly as often" (Tr. 267).

The record reflects that Plaintiff participated in counseling at Baptist Health Care and attended medication management sessions with Dr. Billett at Lakeview through February 2005. Treatment notes indicate that Plaintiff's medication was changed several times during the course of treatment. On December 8, 2004, Plaintiff reported that over the past few months he had gradually improved and had fewer obsessive thoughts, less frequent compulsive behaviors, less anxiety, no depression, and was responding well to medication and had no side effects therefrom (Tr. 238). Dr. Billett noted in treatment notes that Plaintiff's symptoms had abated, but they were not completely resolved (*id.*). On January 25, 2005, Dr. Billett wrote a letter indicating that Plaintiff's symptoms had only partially responded to medication, and despite compliance with medication, he was totally disabled and likely to remain disabled and unable to work for at least the next twelve months.

On February 16, 2005, Dr. Kaberi Samanta examined Plaintiff and opined that he had a GAF score of 55.[6] On March 10, 2005, after examining Plaintiff on only one occasion, Dr. Samanta completed a Supplemental Questionnaire as to RFC, and opined that Plaintiff had moderate limitations in activities of daily living; understanding, remembering, and carrying out instructions

---

[6]A GAF score between 51 and 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994).

in a work setting; and responding appropriately to co-workers (Tr. 291). Next, Dr. Samanta opined that Plaintiff had marked difficulties in maintaining social functioning, responding appropriately to co-workers, and performing simple or repetitive work tasks, as well as marked episodes of deterioration or decompensation in work or work-like settings which cause him to withdraw from that situation or experience exacerbation of signs and symptoms (Tr. 291–92). Dr. Samanta further opined that Plaintiff would frequently have deficiencies in concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner (Tr. 291). Dr. Samanta further opined that Plaintiff's impairments have lasted or could be expected to last twelve months or longer and that the earliest date this level of severity existed was November 7, 2003 (Tr. 292). Dr. Samanta noted that Plaintiff's medications cause side effects, including "headache, somnolence, insomnia, agitation, seizures, [and] tremor" from Paxil, and "hyperpyrexia, muscle rigidity, altered mental status, and tardive dyskinesia" from Risperdal (*id.*). In conclusion, Dr. Samanta opined that Plaintiff is disabled from full-time continuous employment (*id.*). Dr. Samanta, however, qualified her remarks throughout the questionnaire, and at every estimation of Plaintiff's limitations, with the comment "refer to Dr. Billett's notes" (*see* Tr. 291–92). Moreover, under the "Additional Comments" section of the questionnaire, Dr. Samanta stated, "[Patient] transferred to me and seen once. I'm unable to determine at this time. Please refer to Dr. Billett's notes." (*id.*) (emphasis in original).

On April 26, 2005, Plaintiff presented to the Avalon Center for treatment (Tr. 382). Dr. Eveyln Manreal examined Plaintiff and noted that he was taking Paxil and Risperdal. Dr. Manreal recorded Plaintiff's remarks that Paxil was not working because he was engaging in frequent hand washing and taking extended showers. She stated "that the reason why [Plaintiff] cannot go to work is no[t] consistent at this time" (*id.*). Dr. Manreal opined that Plaintiff had a GAF score of 55 and that Plaintiff would benefit from individual psychotherapy and behavioral therapy (*id.*). Plaintiff did not return to the Avalon Center for treatment.

On October 6, 2005, Plaintiff presented to Creekside Psychiatric Center and Dr. Dohn, for treatment (Tr. 331–57). Dr. Dohn indicated that he had previously treated Plaintiff from April through November of 1999 and that Plaintiff was treated with medication that did a "reasonable job" (Tr. 337). Dr. Dohn noted that Plaintiff saw Dr. Billett and Dr. Samanta thereafter because of

insurance considerations, but now decided that he would rather be treated by Dr. Dohn than at Lakeview (*id.*).  Dr. Dohn indicated that Plaintiff was a junior at the University of West Florida (UWF) and was presently taking an online course.  His hobbies included reading, using the computer, and watching movies.  Dr. Dohn diagnosed Plaintiff as having OCD, chronic, of moderate severity, and dysthymic disorder, chronic, of moderate severity (Tr. 338).  He opined that Plaintiff's GAF score had been as high as 75 in the past year (indicative of an individual with no more than slight impairment as to social, occupational, or school functioning) and was 60 at the time of his examination.  Dr. Dohn discontinued Plaintiff's Risperdal and increased his dosage of Zoloft.  On October 31, 2005, Dr. Dohn wrote a letter to the UWF Registrar indicating that Plaintiff had previously been treated by him in 1999 and had completed junior college.  Dr. Dohn further stated that Plaintiff had recently relapsed (i.e., during Plaintiff's junior year at UWF), and he needed to resign from the university (i.e., the Fall 2005 semester) for medical reasons.  Dr. Dohn wrote that Plaintiff would be a responsible and creative student in the future (Tr. 336).

Dr. Dohn provided counseling to Plaintiff through May 2006.  On May 2, 2006, Dr. Dohn noted that Plaintiff needed to attend an OCD program, and on May 6, 2006, he wrote a letter to enable Plaintiff to get food stamps (Tr. 331).  Dr. Dohn indicated that Plaintiff was not functioning extremely well despite medication compliance (*id.*).  He opined that Plaintiff was only minimally functional, remained disabled, and would most likely remain disabled for "years to come, if not a lifetime" (*id.*)  Three months later, on August 11, 2006, Dr. Dohn completed a Supplemental Questionnaire as to RFC (Tr. 383–84).  Dr. Dohn opined that Plaintiff was markedly or extremely limited as to all assessed activities.  He indicated that a psychological evaluation had not been obtained prior to completion of the form assessment.  Dr. Dohn additionally indicated that the earliest date Plaintiff had been functionally limited, as indicated in the form assessment, was unknown.  Finally, Dr. Dohn indicated that Plaintiff experienced the side effects of sedation and weight gain from the medications and was disabled from full-time continuous employment.  The record contains no further treatment notes pertaining to treatment by Dr. Dohn.

C.  Other Information Within Plaintiff's Claim File

On August 29, 2004, Judith LaMarche, Ph.D., completed Psychiatric Review technique and Mental RFC forms (Tr. 206–10, 211–25). Dr. LaMarche opined that Plaintiff had mild restrictions as to functioning in the following two domains: activities of daily living and difficulties in maintaining social functioning. She opined that Plaintiff had a moderate degree of limitation in maintaining concentration, persistence or pace. She also noted that Dr. Billett had indicated on July 12, 2004, that Plaintiff had a good attention span with all areas of cognition grossly intact. On the Mental RFC form, Dr. LaMarche opined that Plaintiff was moderately limited in his abilities to perform activities within a schedule, maintain a regular schedule, and be punctual within customary limits. She additionally opined that Plaintiff was moderately limited in his ability to complete a normal workday or workweek without interruptions and to perform at a consistent pace without an unreasonable number of rest periods of length.

V.  DISCUSSION

Plaintiff raises several issues on appeal, all of which relate to the ALJ's consideration of the opinions of his treating physicians. First, Plaintiff contends the ALJ erred in failing to assign proper weight to opinions of Dr. Samanta and Dr. Dohn. Additionally, Plaintiff contends the ALJ erred in failing to recontact Dr. Samanta to obtain additional information. Finally, Plaintiff contends the ALJ impermissibly substituted his judgment for that of Plaintiff's physicians (*see* Doc. 9).

A.  Weighing the Opinions of Treating Physicians

Substantial weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise. *See* Lewis v. Callahan, 125 F.3d 1436, 1439–41 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); Sabo v. Commissioner of Social Security, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d). "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See* Edwards, 937 F.2d at 580 (finding that the ALJ properly discounted

treating physician's report where the physician was unsure of the accuracy of his findings and statements). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See* Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also* Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; 4) consistency with the record as a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion. *See* Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether Plaintiff meets a listed impairment, a claimant's RFC (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors, because those ultimate determinations are the providence of the Commissioner. 20 C.F.R. § 404.1527(e). The opinion by a treating physician that a patient is "unable to work" or is "disabled" is not dispositive for purposes of Social Security claims. The Commissioner's regulations and the interpretations of those regulations clearly provide that an ALJ should give weight to a physician's opinions concerning the nature and severity of a claimant's impairments, but that the ultimate question of whether there is disability or inability to work is reserved to the Commissioner. For instance, 20 C.F.R. § 404.1527(e)(1) specifically states that a finding of disability or inability to work by a medical source does not mean that the Commissioner will automatically reach the same conclusion. Furthermore, the Commissioner "will not give any special significance to the source" of an opinion on issues reserved for the Commissioner. 20 C.F.R. § 404.1527(e)(3); *see also* Social Security Ruling 96-5p (whether an individual is disabled is a

question reserved to the Commissioner; treating source opinions on such questions are "never entitled to controlling weight or special significance"). Although such opinions on disability are not entitled to controlling weight, they must not be ignored, and the Commissioner must examine the entire record to determine whether such opinions are supported by the record. SSR 96-5p. In Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997), the court reversed the ALJ's finding of no disability, in part because the ALJ relied on a treating physician's report that the claimant could no longer work as a longshoreman when this report was ambiguous as to whether the claimant could do any work, and the physician subsequently wrote a letter saying the claimant was completely disabled. To require the Commissioner to accept as controlling a statement that a patient is or is not disabled would require the Commissioner to credit the physician not only with knowledge of the patient's physical condition, but also with an understanding of the nuances of how the regulations analyze physical limitations with respect to job experience, age, education, transferability of skills, the definitions of the various levels of exertion relevant to types of work, and similar matters. Additionally, a physician's opinion on whether a person is able to work may be colored by such things as the physician's knowledge of local hiring practices, whether there are specific job vacancies, a person's reluctance to do a particular kind of work, and similar matters. These things are not properly considered by the Commissioner in determining disability. 20 C.F.R. § 404.1566. For all these reasons, a physician's opinion that his or her patient cannot work or is disabled is not a conclusive medical opinion for the purpose of Social Security benefits determinations and by itself is not entitled to special significance.

Finally, the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole. *See* Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." Oldham v. Schweiker, 660 F.2d 1078, 1084 (Former 5th Cir. Unit B Nov. 1981).

       1.    Dr. Samanta

Plaintiff contends the ALJ erred in rejecting the opinion of treating physician Dr. Samanta, rendered on March 10, 2005, that Plaintiff has moderate to marked functional limitations, that have

lasted or would be expected to last twelve months or longer, and Plaintiff has been so limited since November 7, 2003. In rejecting these opinions, the ALJ correctly noted Dr. Samanta's "admitted lack of knowledge" regarding Plaintiff's functional limitations (Tr. 18). Indeed, as discussed above, Dr. Samanta stated he was unable to make determinations regarding Plaintiff's capacities (*see* Tr. 292), despite having provided opinions elsewhere on the RFC questionnaire. However, as noted by the ALJ, the opinions found elsewhere on the form are repeatedly followed by the phrase, "refer to Dr. Billett's notes" (Tr. 18, 291–92). Thus, Dr. Samanta was unable to make an independent assessment of Plaintiff's limitations, and he provided what appears to be an interpretation of Dr. Billett's opinions,[7] while specifically noting that he was "unable to determine" Plaintiff's capacities. Moreover, as noted by the ALJ, Dr. Samanta had examined Plaintiff on only one occasion before rendering the opinions at issue (Tr. 18).

Thus, contrary to Plaintiff's assertion, the court does not find that Dr. Samanta was a treating physician at the time he rendered the relevant opinions. Because much of the rationale underlying the treating physician rule involves the physician's familiarity with his patient, it does not apply to a physician who bases his opinion of a claimant's limitations upon a single visit. In other words, the "treating physician" rule does not apply to Dr. Samanta. *See* Gibson v. Heckler, 779 F.2d 619, 623 (11th Cir. 1986) (noting that rule giving great weight to physician's opinion does not apply where physician has only examined patient one time). Accordingly, great deference was not owed to the opinions of Dr. Samanta dated March 10, 2005. Moreover, the ALJ's reasons for assigning no weight to those opinions are well founded and well supported.

In a related argument, Plaintiff asserts that the ALJ erred in rejecting Dr. Samanta's opinions because a treating physician's opinion rendered after the date a claimant's insured status has expired is nevertheless relevant, citing Boyd v. Heckler, 704 F.2d 1207 (11th Cir. 1983) (Doc. 9 at 9). However, Plaintiff's reliance on Boyd is misplaced, as the court has concluded that Dr. Samanta was not a treating physician at the time he rendered the opinions at issue. Furthermore, the ALJ did not

---

[7]Interestingly, however, Dr. Samanta opined in March 2005 that Plaintiff experienced numerous side effects from Paxil and Risperdal, but Plaintiff reported to Dr. Billett in December 2004 that he had no side effects "whatsoever" from his medications (*see* Tr. 238, 292). Thus, although Dr. Samanta apparently relied on Dr. Billett's notes to form his opinions, an obvious inconsistency exists.

Case No. 3:07cv129/LAC/EMT

reject the opinion on the ground that it was a "retrospective opinion" (i.e., one rendered by a physician who did not treat the claimant until after the time frame relevant to the disability determination), as in Boyd. Indeed, Dr. Samanta's opinion was rendered well before March 31, 2009, the date Plaintiff's insured status expires, and prior to November 3, 2006, the date of the ALJ's opinion. Thus, unlike the retrospective opinion at issue in Boyd, in the instant case, Dr. Samanta's opinion was rendered before he started treating Plaintiff.

Plaintiff additionally contends, however, that Dr. Samanta saw Plaintiff numerous times after March 10, 2005, and therefore, the ALJ should have recontacted him to clarify his March 2005 opinion (Doc. 9 at 9).

"A hearing before an ALJ is not an adversarial proceeding," and "the ALJ has a basic obligation to develop a full and fair record." Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997). Medical sources should be recontacted when the evidence received from that source is inadequate to determine whether the claimant is disabled. 20 C.F.R. § 404.1512(e). If the medical sources do not provide sufficient medical evidence, the ALJ may order a physical or mental consultive examination at the government's expense. 20 C.F.R. § 404.1517. However, the ALJ is not required to order an examination if such an examination is not necessary in order to enable the ALJ to make a disability determination. *See* Wilson v. Apfel, 179 F.3d 1276, 1278 (11th Cir. 1999) (holding that additional medical testimony was unnecessary where the record was sufficient for a decision). In evaluating Plaintiff's contention, this court should consider "whether the record reveals evidentiary gaps which result in unfairness or clear prejudice." Brown v. Shalala, 44 F.3d 931, 935 (11th Cir. 1995) (quotations and citations omitted). "[T]here must be a showing of prejudice before it is found that the claimant's right to due process has been violated to such a degree that the case must be remanded to the [Commissioner] for further development of the record." Graham, 129 F.3d at 1423.

The ALJ's failure to recontact Dr. Samanta did not constitute a failure to develop of a full and fair record because there is evidence in the record regarding Plaintiff's condition subsequent to his treatment by Dr. Samanta, including records from Dr. Manreal and Dr. Dohn, and prior to his treatment by Dr. Samanta, including records from Dr. Billett and Baptist Health Care. Thus, there

are no evidentiary gaps in the record that would have required the ALJ to recontact Dr. Samanta, and accordingly, he did not err in failing to do so.

        2.      Dr. Dohn

Next, Plaintiff contends the ALJ erred in rejecting the opinions of Dr. Dohn, a treating physician (Doc. 9 at 9). The ALJ explained that he was not assigning controlling weight to Dr. Dohn's opinion that Plaintiff was "disabled," or to his opinions on a mental RFC form completed in August 2006 (Tr. 19, 331), and the ALJ provided reasons for discounting the opinions.

First, as the ALJ correctly observed, "the issue of whether an individual is disabled is one reserved for the Commissioner" (Tr. 19). Title 20 C.F.R. § 404.1527(e)(1) specifically states that a finding of disability or inability to work by a medical source does not mean that the Commissioner will automatically reach the same conclusion. Furthermore, the Commissioner "will not give any special significance to the source" of an opinion on issues reserved for the Commissioner. 20 C.F.R. § 404.1527(e)(3); *see also* Social Security Ruling 96-5p (whether an individual is disabled is a question reserved to the Commissioner; treating source opinions on such questions are "never entitled to controlling weight or special significance").

Next, regarding the August 2006 RFC form, the ALJ discounted Dr. Dohn's opinion that Plaintiff had "marked" or even "extreme" limitations in nearly every category of functioning, including social functioning, decompensation at work, and activities of daily living (Tr. 383–84). The ALJ noted that the limitations were inconsistent with Dr. Dohn's treatment notes and other evidence of Plaintiff's functionality (*see* Tr. 19–20). The ALJ specifically referenced Dr. Dohn's finding in October 2005 that Plaintiff had only moderate limitations of function (Tr. 19). Indeed, Dr. Dohn's initial meeting with Plaintiff, when he resumed treatment with Dr. Dohn in October 2005, revealed that Plaintiff was suffering OCD of "moderate severity" and dysthymic disorder of "moderate severity," and Dr. Dohn further opined that Plaintiff's GAF score was 60, currently, and as high as 75 in the past year, indicating that Plaintiff's symptoms were not particularly extreme (Tr. 338). Moreover, other treatment notes from Dr. Dohn generally indicate that Plaintiff was "doing better," and that he was alert, coherent, and attentive, despite showing signs of sadness and worry (*see, e.g.*, Tr. 334–35 (treatment notes from November 2005 and January 2006)). None of Dr. Dohn's notes make any mention of Plaintiff having marked restrictions in social functioning, any

difficulty concentrating, or any sign that he might "decompensate" (Tr. 338, 383–84). Stated another way, Dr. Dohn's treatment notes contain no support for the rather dire assessment of Plaintiff's mental functioning found on the August 2006 RFC form. *See* Phillips v. Barnhart, 357 F.3d at 1240–41 (treating physician's opinion properly discounted if it is conclusory or inconsistent with the physician's own medical records). Furthermore, the ALJ noted that Dr. Dohn had not seen Plaintiff for three months at the time he completed the form, he could not state the date that Plaintiff became as limited as described on the form, and he had not performed a psychological assessment prior to or contemporaneous with completing the form (Tr. 19). Additionally, in October 2005, Dr. Dohn wrote a letter to UWF in which he indicated that Plaintiff would be a responsible and creative student in the future, but in May 2006 he rather inconsistently opined that Plaintiff would likely be disabled for "years to come, if not a lifetime" (Tr. 336, 331).

The ALJ also noted that Dr. Dohn treated Plaintiff for worse symptoms in 1999, prior to Plaintiff's alleged onset date of disability, but Plaintiff did not allege disability at that time and even worked a full time job (Tr. 19–20; *see also* Tr. 52 (earnings records)). In other words, one of the ALJ's key findings was that Plaintiff had suffered from OCD symptoms for several years, and according to Dr. Dohn's records he suffered worse symptoms in 1999 than in 2005, but he had been able to work despite the problem (*id.*). For example, Dr. Dohn's notes from 1999 indicated that Plaintiff had a GAF of 50 (and as high as 60 in the last year), and he was engaged in compulsive behavior up to three hours per day (Tr. 20, 175–76). During the 2004–2005 relevant period of this case, however, Dr. Dohn made little mention of the amount of time Plaintiff spent on compulsive behaviors, and his GAF was estimated to be 60, currently, and as high as 75 in the last year, suggesting that Plaintiff's condition was now less serious. Nevertheless, Plaintiff did not allege he was disabled during the earlier time period, and he held full-time employment at that time and through late May 2003 (*see* Tr. 20, 52, 75). *See* Goff v. Barnhart, 421 F.3d 785, 792–93 (8th Cir. 2005) (fact that claimant gainfully worked with her impairment, after suffering a second stroke, coupled with the absence of evidence of significant deterioration in her condition, demonstrates that her impairments are not disabling in the present). Moreover, this apparent contrast between Plaintiff's condition in 1999 and 2005 calls into question the accuracy of Dr. Dohn's mental RFC

assessment in 2006 (*see* Tr. 20). Such inconsistencies in a doctor's assessment are proper factors for an ALJ to cite in discounting that doctor's opinion.

Moreover, as noted by the ALJ, in 1999 Plaintiff participated in individual therapy but quit due to a decrease in his symptoms, and he did not present for treatment for several years (*see* Tr. 20 (opinion of ALJ referencing Tr. 341 (Dr. Dohn's notes, documenting that Plaintiff was doing "okay," his medication was working, and he had no complaints on November 16, 1999), Tr. 342–43 (notes documenting termination of therapy on November 4, 1999)). "A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling." Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) (citation omitted).

Furthermore, Plaintiff continued to work for substantial portions of the relevant period. While his work activity was not "substantial gainful activity," it certainly belies the more extreme limitations suggested by Dr. Dohn's medical source statement. For example, Plaintiff worked approximately twenty hours per week in 2003, and for one month during 2004 (Tr. 52–59, 77–78), which contradicts Dr. Dohn's opinions. If Plaintiff were suffering "extreme" decompensation and marked difficulty with social interaction and concentration, as Dr. Dohn opined, it is doubtful he would have been able to stay at a job at all, much less for several months. *See* 20 C.F.R. § 404.1571 (work performed during any period in which a claimant alleges that he was under a disability may demonstrate an ability to perform SGA).

Finally, in discounting Dr. Dohn's opinions, the ALJ stated, "the undersigned finds significant the fact that Dr. Dohn did not specify particular functional limitations" (Tr. 19). Plaintiff asserts that this reason is erroneous, as Dr. Dohn clearly identified both "marked" and "extreme" functional limitations (*see* Doc. 9 at 9–10). However, a review of the entire discussion in which this statement is found reveals that the ALJ was referencing the letter Dr. Dohn wrote on May 6, 2006, to assist Plaintiff in obtaining food stamps, which did not contain any functional limitations (*see* Tr. 331). Immediately after the ALJ's statement, he further stated "[t]hree months later, on August 11, 2006, Dr. Dohn completed a Supplemental Questionnaire as to [RFC]," on which he indicated that Plaintiff was markedly or extremely limited as to all assessed activities (Tr. 19). Thus, Plaintiff has taken the statement out of context, and when the entire discussion is read, it is clear the ALJ knew

that Dr. Dohn ultimately specified Plaintiff's functional limitations, and he discounted those limitations for the reasons previously discussed.

In conclusion, the ALJ cited legally sufficient reasons for disagreeing with Dr. Dohn's assessment, and the reasons have substantial support in the record. Thus, the ALJ did not err.

B. Whether the ALJ Improperly Substituted his Opinion for Those of Plaintiff's Treating Physicians

Plaintiff contends the ALJ improperly substituted his opinions for those of Plaintiff's treating physicians, including Dr. Billett, Dr. Samanta, and Dr. Dohn, all of whom opined that Plaintiff has "marked" mental limitations due to his OCD (Doc. 9 at 13).

Initially, while Plaintiff has not discussed the opinion of Dr. Billett at length in his memorandum, and does not contend that the ALJ erred in his evaluation of Dr. Billett's opinion, the court notes that the ALJ was justified in discounting his conclusory opinion, rendered on January 25, 2005, that Plaintiff was "totally disabled and likely to remain disabled and unable to work for at least the next 12 months" (Tr. 236). As noted by the ALJ, whether or not Plaintiff is disabled is a determination that is to be made by the Commissioner, not a physician (Tr. 18). Additionally, the ALJ specifically noted that "Dr. Billett's assessment is contradicted by his treatment notations," and he failed to "elaborate as to particular symptoms and limitations of functioning" (*id.*). Indeed, in pertinent part, the court notes that Dr. Billett's treatment notes reflect that Plaintiff improved with medication (*see, e.g.,* Tr. 267, 279), and in December 2004 — the month before Dr. Billett opined that Plaintiff was disabled — he noted that Plaintiff's OCD symptoms had abated (Tr. 238). Therefore, good cause existed to discount Dr. Billett's opinion.

Thus, having properly discounted the opinions of Plaintiff's physicians, the ALJ next determined Plaintiff's RFC. In doing so, however, he did not substitute his own opinion for the opinions of Plaintiff's physicians; nor did he devise his own RFC as Plaintiff suggests (*see* Doc. 9 at 13–14). Rather, the ALJ relied on the opinion of Dr. LaMarche, a non-examining doctor who reviewed Plaintiff's medical records and rendered an opinion as to Plaintiff's RFC, as detailed *supra* (Tr. 20, 206–25). The ALJ gave specific citations to portions of the record that supported Dr. LaMarche's assessment, such as Dr. Billett's mental status examination of July 12, 2004 (Tr. 20). It was proper for the ALJ to rely on Dr. LaMarche's opinion because, as noted above, each of the

opinions of Plaintiff's treating physicians suffered serious defects (e.g., Dr. Samanta rendered an opinion without being familiar with Plaintiff, Dr. Dohn's extreme limitations were not supported by his own treatment notes or other evidence, and Dr. Billett's opinion was conclusory and contradicted by his own treatment notes).  Thus, in the absence of controlling treating physician opinions, the ALJ may rely on the opinion of the non-examining source. *See* 20 C.F.R. § 404.1527 (every medical opinion should be evaluated, and unless a treating source's opinion is given controlling weight, the following factors are considered in deciding the weight to be given to any medical opinion: examining versus non-examining (the opinion of an examining source is given more weight than a non-examining source); treatment relationship (opinions of treating sources are given more weight), including length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship; supportability of the opinion(s); consistency with the record as a whole; specialization; and "other factors").  Here, although normally entitled to the least amount of weight, the opinion of Dr. LaMarche became particularly important, as the other physicians' opinions were discounted by the ALJ.  *See, e.g.*, Tindell v. Barnhart, 444 F.3d 1002, 1005–06 (8th Cir. 2006) ("We recognize that generally examining source opinions should be given greater weight than that given to a psychologist who has never met the claimant and bases his opinion solely on the record[,] [b]ut the ALJ sufficiently explained the inconsistencies that led him to give greater weight to the consultative opinion [], and we agree with his assessment of the evidence from the record as a whole").

Although evidence in the record arguably exists to support a decision contrary to that reached by the ALJ, this court is limited in its inquiry and is not empowered to reweigh the evidence.  *See generally* Martin, 894 F.2d at 1529 (the reviewing court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner); Sewell, 792 F.2d at 1067 (even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence).

For the foregoing reasons, this court concludes that the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at 1560.  Furthermore, Plaintiff has failed to show that the ALJ applied improper legal

standards, erred in making his findings, or that any other ground for reversal exists.[8]

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 26th day of February 2008.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

**Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof. Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings.** *See* **28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**

---

[8] Plaintiff has requested that his case be heard by a different ALJ if this case is remanded, alleging that the ALJ was biased, based on the ALJ's comment to Plaintiff that "you're kind of programmed to defeat" (*see* Doc. 9 at 15). In light of this court's recommendation to affirm the decision of the Commissioner, the undersigned has not specifically addressed Plaintiff's request. However, in the event this Report and Recommendation is not adopted, the undersigned does not find it necessary for Plaintiff's case to be heard by a different ALJ. *See, e.g.*, Liteky v. United States, 510 U.S. 540, 555–56, 114 S. Ct. 1147, 1157, 127 L. Ed. 2d 474 (1994) (a trial judge's "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display" are not enough to establish bias); *see also* Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) ("In light of the ALJ's detailed and reasoned written grounds for ruling against Bayliss, we conclude that the statements in the ALJ's opinion in which the ALJ expressed displeasure with the conduct of Bayliss's counsel are not sufficient to establish bias."). Plaintiff must show that the ALJ's behavior, in the context of the whole case, was "so extreme as to display clear inability to render fair judgment." Liteky, 510 U.S. at 551, 114 S. Ct. 1147. Plaintiff has pointed to nothing in the record that rises to this level. The court's determination, however, does not mean that the court approves of the conduct of the ALJ, including his rhetorical questions, debates, and sarcasm (*see, e.g.*, (Tr. 478) ("Is there a problem with him [Plaintiff] not having seizures?"), (Tr. 484) (debating with Plaintiff the meaning of Plaintiff's statement that he "voluntarily quit"), (Tr. 484) (ALJ's statement that Plaintiff "showed them" [his employer] by "beating them to the punch" and quitting before he was fired), (Tr. 487) (ALJ's comment that "transportation is not a disabling condition"), (Tr. 489) (ALJ's question, "you must have an interesting lifestyle"), (Tr. 490–91, 493) (ALJ's questions and statements, that "you [Plaintiff] were exiled" to live in Livingston, Louisiana? "What [] "choice [did] you ha[ve]? Was it Angola State Prison . . . or Chatahoochee [presumably referring to a Florida State Mental Hospital]" . . . "this is fascinating, go ahead . . ." . . . "so, you got chased out of the house?")).